Joe TYNAN, Plaintiff-Appellant†,

v.

JBVBB, LLC, a Wisconsin limited liability company, ABFM Corporation, a Wisconsin corporation, and ABQC Corporation, a Wisconsin corporation, Defendants-Respondents.

Court of Appeals

*No. 2006AP2891. Submitted on Briefs September 4, 2007. —Decided November 6, 2007.*

2007 WI App 265

(Also reported in 743 N.W.2d 730.)

† Petition to review denied 2/21/08.

On behalf of the plaintiff-appellant, the cause was submitted on the briefs of *Lawrence Bensky* and *Amie B. Trupke* of Stafford Rosenbaum LLP, of Madison.

On behalf of the defendants-respondents, the cause was submitted on the brief of *Joshua L. Gimbel* and *Amy Schmidt Jones* of *Michael Best & Friedrich LLP*, of Milwaukee.

Before Curley, P.J., Wedemeyer and Fine, JJ.

¶ 1. WEDEMEYER, J. Joe Tynan appeals from a judgment entered on his promissory estoppel claim in favor of defendants JBVBB, LLC, ABFM Corporation and ABQC Corporation. Tynan claims: (1) there was insufficient evidence to support the trial court's finding that regardless of whether the plaintiff had held out for a long-term employment contract, no contract would have come to fruition; (2) the trial court erred in precluding expectation damages in favor of reliance damages on the promissory estoppel claim; and (3) this court can determine his severance damages and remand for a determination of bonus damages and prejudgment interest. Because the trial court's finding that the parties would not have entered a formal contract regardless of whether Tynan had held out for one is not clearly erroneous, and because the trial court did not err in ruling that Tynan failed to prove he suffered any reliance damages for his promissory estoppel claim, we affirm the judgment.[1]

## BACKGROUND

¶ 2. This case involves a dispute between the plaintiff, Tynan, and defendant JBVBB, LLC and its two subsidiaries, defendants ABFM Corporation and ABQC Corporation (collectively "the Company"). JBVBB provided oversight services to ABFM and ABQC, and was owned by Joel S. Lee, William R. Nimtz and Michael Wacker. In 1998 and 1999, ABFM, a sheet metal fabricating business, and ABQC, a metal plating and finishing business, were operating at substantial

---

[1] Because we have rejected Tynan's second claim, it is not necessary for us to address his third issue as to the amount of any expectation damages for salary continuation and health insurance premiums.

losses. Lee and Nimtz sought a business executive to turn the two subsidiaries around. Meanwhile, in the Spring of 1999, Tynan had terminated his employment with Lincoln Plating Company and had begun a job search that involved mailing out approximately 12,000 resumes. One such resume landed on the desk of one of the owners of JBVBB, and in late July 1999, Tynan began working as a consultant for the Company. Tynan was paid a consulting fee of $1500 per day, and worked on an average of nine days per month for the Company.

¶ 3. By October 1999, Tynan and the Company were negotiating a full-time employment contract. On October 7, 1999, Lee, who had the authority to make a binding contract on behalf of JBVBB, gave Tynan an initial written proposal. During that month, Lee and Tynan negotiated the terms of employment, both orally and via written correspondence. The parties could not agree on the terms of a long-term contract and continued to negotiate those terms.

¶ 4. While negotiation continued, Tynan started working full-time for JBVBB in November 1999, as the Group Vice President for Affiliates without a long-term contract. Under the terms of an interim agreement, Tynan was being paid in excess of $200,000 per year, plus some, but not all of the benefits he was seeking in his long-term contract. Tynan and Lee had substantial differences as to the terms of certain bonuses that Tynan was seeking from JBVBB. The trial court determined that Tynan's and JBVBB's differences over the terms of the employment contract sought by Tynan were so substantial that no matter the timing of further negotiations, and regardless of whether Tynan had held out for a long-term employment contract before he came to work for the Company, no contract would have come to fruition.

¶ 5. JBVBB became dissatisfied with Tynan's performance in late January or early February of 2000, and by the summer of 2000, Tynan was working mainly on special projects for Lee and provided few services for the Company. Lee notified Tynan that he should leave the plant office and move to Lee's office downtown, where he could work on special projects and look for a new job. Lee indicated that Tynan would continue to be paid for ninety days under this arrangement. Tynan abided by Lee's instruction, moved offices, and continued working for JBVBB until October 31, 2000. On that date, Tynan received his last paycheck. After leaving JBVBB, Tynan took a position at Gates City Steel despite a significantly lower salary because the job was available immediately and it was located in his hometown. Furthermore, Tynan did not want to go through the stress of another job hunt, nor did he want to return to consulting.

¶ 6. On November 22, 2000, Tynan filed this lawsuit alleging breach of contract, breach of duty of good faith, promissory estoppel and misrepresentation. Subsequently, defendants JBVBB, ABFM Corporation and ABQC Corporation filed a motion to dismiss. The trial court denied the motion to dismiss the breach of contract, breach of duty of good faith and promissory estoppel claims, but dismissed the misrepresentation claim. On October 31, 2002, the trial court granted summary judgment to the defendants on the three remaining claims. Tynan appealed, and this court, in an unpublished opinion, reversed the judgment and remanded the cause for further proceedings, and affirmed the trial court's order dismissing the misrepresentation claim.

¶ 7. In a special verdict dated June 10, 2005, the jury did not find a contract existed, but did find that Tynan relied upon binding promises made by Lee about

salary and health insurance benefit continuation, incentive bonuses and equity growth bonuses. The jury found that in late October 1999, Lee promised Tynan that if he came to work for JBVBB full time, he would be paid an incentive bonus and an equity growth bonus and that if his employment was terminated, he would be entitled to the continuation of his salary and benefits for a period following termination. The jury also found that in reliance upon Lee's promise, Tynan decided to go to work for JBVBB and move his family from Lincoln, Nebraska to Milwaukee. The defendants then moved for judgment notwithstanding the verdict and to change the jury's answers, which the trial court denied.

¶ 8. Approximately one month after the verdict was entered, the trial judge held a hearing to determine damages. At the hearing, Tynan alleged that if he had not relied upon Lee's promises, he would have pursued one of three other alternatives which would have paid him more money over time: (1) he might have held out for a long-term contract with JBVBB that would have included certain severance and health benefit continuation provisions; or (2) he might have continued consulting for JBVBB and then looked for consulting work or employment elsewhere; or (3) he might have consulted for another company, MI Industries, until obtaining full-time employment there. On September 25, 2006, the trial court held that Tynan did not prove reliance damages under any of the above three scenarios, and ordered that judgment be entered in favor of the defendants. Tynan now appeals from this judgment.

## DISCUSSION

¶ 9. This case arises from a judgment on a promissory estoppel claim in favor of the defendants. When

reviewing a factual determination of a trial judge, an appellate court will not reverse unless the finding is clearly erroneous. WIS. STAT. § 805.17(2) (2005–06).[2] A discretionary act of the trial court will be upheld if it considered the facts of record under the proper legal standard and reasoned its way to a rational conclusion. *See Mills v.* Vilas County Bd. *of Adjustments*, 2003 WI App 66, ¶ 19, 261 Wis. 2d 598, 660 N.W.2d 705; *Loy v. Bunderson*, 107 Wis. 2d 400, 414–15, 320 N.W.2d 175 (1982). However, the application of case law to a set of facts presents questions of law, which we review *de novo. Brown v. State*, 230 Wis. 2d 355, 363–64, 602 N.W.2d 79 (Ct. App. 1999).

A. *Insufficient Evidence.*

¶ 10. The first issue Tynan raises is whether there was sufficient evidence to support the trial court's finding that regardless of whether the plaintiff had held out for a long-term employment contract, no contract would have come to fruition.

¶ 11. The circuit court's findings of fact shall not be set aside unless clearly erroneous. WIS. STAT. § 805.17(2). In this case, the plaintiff admits that the circuit court's findings are not contrary to the facts of the case. Rather, Tynan is urging this court to adopt his own inference from the facts that the parties had mutually strong incentives in November 1999, to enter into a formal employment contract and would have entered into such a contract if Tynan had held out for one. The plaintiff cites several facts from the record to support this inference, but again the plaintiff admits

[2] All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

529

that the circuit court's factual findings do not *reject* the proof of mutually strong incentives. As our supreme court has stated, "[w]hen more than one reasonable inference can be drawn from the credible evidence, the reviewing court must accept the inference drawn by the trier of fact." *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979). There is credible evidence in the record to support the inferences made by the trial court. Tynan strongly believed he had a right to expect a growth equity bonus, whether JBVBB was willing to confer it or not. The parties exchanged numerous terms sheets and contract drafts before, and after Tynan began full-time employment at JBVBB. Tynan even acknowledged to JBVBB in his parting correspondence on November 1, 2000, that the amount of the equity growth bonus was still in dispute. Therefore, under our standard of review, we are bound to the trial court's inference because it is reasonable. Accordingly, we affirm this portion of the judgment.

## B. Promissory Estoppel.

¶ 12. Tynan's second contention is that the trial court erred in precluding expectation damages in favor of reliance damages on the promissory estoppel claim. Tynan argued his damages should be measured by his expectation of what he would gain, i.e., the value of the benefits that were promised to him, whereas JBVBB argued that his damages should be measured by the detriment he suffered, if any, by relying on the promises. The trial court ruled that the damages awarded "should be only such as in the opinion of the court are necessary to prevent injustice." It then proceeded to analyze whether justice in this case required expectation or reliance damages, concluding that reliance dam-

ages, if any, was the appropriate remedy. We agree with the trial court's determination.

█

¶ 13. In order to prevail on a promissory estoppel claim, the claimant must satisfy three elements: "Was the promise one which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee? Did the promise induce such action or forbearance? Can injustice be avoided only by enforcement of the promise?" *Hoffman v. Red Owl Stores, Inc.*, 26 Wis. 2d 683, 698, 133 N.W.2d 267 (1965). While the first two elements present issues of fact which will ordinarily be resolved by a jury, the third element—that the remedy can only be invoked where necessary to avoid injustice—is one that involves a policy decision by the court. *Id.* In this case, the jury found the first two elements of promissory estoppel were satisfied. According to the jury, Lee's promises about an incentive bonus, equity growth bonus, and continued salary and health benefits were ones which Lee reasonably should have expected to induce, and which did induce, Tynan to come to work for JBVBB as an employee instead of remaining as a consultant. Thus, the third element of promissory estoppel, "Can injustice be avoided only by enforcement of a promise?" was all that was left for the court to decide in this case. *Id.* In response to this policy question, the trial court ruled that because Tynan did not demonstrate a sufficient likelihood that he would have been better off either consulting or working for another company, his reliance was not detrimental to him; and in the absence of detrimental reliance, there is no injustice to be avoided. Although the injustice element of promissory estoppel necessarily embraces an element of discretion, *U.S. Oil Co. v. Midwest Auto Care*

531

*Servs., Inc.*, 150 Wis. 2d 80, 89, 440 N.W.2d 825 (Ct. App. 1989), in light of this court's recent decision in *Skebba v. Kasch*, 2006 WI App 232, 297 Wis. 2d 401, 724 N.W.2d 408, we review this case *de novo* and conclude that the trial court did not err in limiting the promissory estoppel claim to reliance damages.

¶ 14. *Skebba*, which was decided a month after this case, clarified *Hoffman*'s use of reliance as a measurement of damages for promissory estoppel. *Hoffman* was the first case in Wisconsin to adopt promissory estoppel. In considering damages for promissory estoppel, the *Hoffman* court held that "[e]nforcement of a promise does not necessarily mean Specific Performance. It does not necessarily mean Damages for breach . . . . In determining what justice requires, the court must remember all of its powers, derived from equity, law merchant, and other sources, as well as the common law." *Id.*, 26 Wis. 2d at 701–02 (citations, emphasis and quotations omitted). *S kebba* correctly interpreted the language in *Hoffman* to mean that "specific performance is neither precluded nor disfavored as a remedy for promissory estoppel; preventing injustice is the objective." *Skebba*, 297 Wis. 2d 401, ¶ 14. In order to "prevent injusticea court must be able to fashion a remedy that restores the promisee to where he or she would be if the promisor had fulfilled the promise." *Id.*, ¶ 12. In *Skebba*, the plaintiff (Skebba) turned down another job offer and stayed on as an employee of the defendant's (Kasch) financially troubled company, in reliance upon a promise that the defendant would pay him $250,000 if one of "three conditions occurred: (1) the company was sold; (2) Skebba was lawfully terminated; or (3) Skebba retired." *Id.*, at ¶ 3. Upon the sale of the business, Kasch refused to pay the $250,000 he promised to Skebba and

denied ever having made such an agreement. *Id.*, ¶ 4. For six years Kasch was able to enjoy the fruits of Skebba's reliance, *see id.*, ¶¶ 4, 12, but the trial court concluded that "because Skebba did not prove what he would have earned had he taken the job with the other company, he [can]not establish what he had lost by relying on Kasch's promise and, therefore, [has] not [proven] his damages." *Id.*, ¶ 5. On appeal, this court concluded that the record compelled specific performance of the promise because otherwise the promisor would enjoy all the benefits of induced reliance while the promisee will be deprived of that which he was promised, with no other remedies available. *Id.*, ¶ 13. "Skebba's loss has nothing to do with what he might have earned on another job. Income from the rejected job was never part of the calculus of the promise made and relied upon." *Id.*, ¶ 14.

¶ 15. Tynan contends that the facts in his case are the same as those in *Skebba*, that *Skebba* controls the outcome of this case, and that the trial court erred in concluding that reliance damages, rather than expectation damages were appropriate in this case. We reject Tynan's contention. The facts in this case are distinguishable from the facts in *Skebba*. The trial court here expressly recognized that it could award either expectation damages (specific performance) or reliance damages, and that it had the discretion to determine "which method best fits the equities of a given case." In so doing, the trial court explained:

> Coming to this understanding of the duality of the law of promissory estoppel damages has shifted my thinking about damages in this case. My initial reaction to Mr. Tynan's claim before I studied the cases was that he should be restricted to his reliance damages.

533

My belief at the time was that for systemic reasons allowing a plaintiff in a promissory estoppel action to claim expectation damages would erode the integrity of the contracting process. My feeling was that routinely permitting parties to enforce promises that did not ripen into a contract would weaken the discipline the law tries to impose on markets where contracts are negotiated.

In other words, if courts teach parties that they can get contract damages without touching all the contract bases, parties might grow more lax about making sure that they have touched all the right bases. As I mentioned above, the disputes that are bound to arise out of markets that are not well-disciplined by contract law are messier, they're harder on the parties, they are resource-consuming for the courts, and they introduce uncertainty rather than predictability in the markets and render them less efficient.

But having reviewed *Hoffman* and its progeny I have learned that discretion is conferred on me to consider both measures of damage and to consider which of the measures is more equitable in the circumstances of this dispute. To not consider one or the other for blanket philosophy reasons like those that occurred to me initially would constitute I believe an abuse of discretion.

The trial court went on to address the factors to consider in determining whether to award reliance or expectation damages:

One factor that I consider is how clear the promises were. The clearer the promise, the fairer it seems to me it is to hold the promissor to the promise and enforce the expectations of the promisee.

As Mr. Tynan himself recognizes, the expectation measure of damages is not appropriate for quasi-contract claims that lack definiteness.

¶ 16. Here, the substantial promises Tynan seeks to enforce were not clear. These parties were unable to reach agreement as to substantial terms of a long-term contract. As a result, Tynan agreed to an interim contract, which did not include the expectation damages he sought at trial. The negotiations back and forth between the parties continued for months and as noted above, the trial court found the parties would never have reached an agreement on the long-term contract. The incentive bonus Tynan seeks is not clear and based on contingencies that were not satisfied—such as whether Tynan was still working for the Company at the end of the year. Further, to allow six months severance for less than a year of work on top of the benefit provided of three months pay while looking for another job appears unreasonable.

¶ 17. Another factor considered by the trial court was how long Tynan worked for the Company. The trial court noted that the length of time was murky, but found that by the end of Summer 2000, Tynan had been moved out of his original office, was no longer actively working in the position he took in November of 1999, and therefore was in effect terminated at the end of August 2000. The trial court reasoned: "Further, it seems to me that the longer an employee works for a company the more his or her expectations take root and vice versa."

¶ 18. In *Skebba*, the expectations were clear. If Skebba stayed with the company he would receive $250,000 when a triggering event occurred. In addition, Skebba worked for the company for six more years after negotiating the $250,000 bonus. Such is not the case here. The expectations were never specifically agreed upon and Tynan worked for the Company for less than

one year. Moreover, as noted later in this opinion, Tynan's reliance was not detrimental.

¶ 19. The trial court also considered whether Lee and the Company engaged in any bad faith or other tortuous activity, which would cause a reliance rather than expectation award to be unjust. There was no evidence of bad faith or otherwise tortuous conduct by Lee or the Company. Although the trial court found Lee could have been more frank with Tynan, such was mitigated by Lee's "good will" of allowing Tynan an office to work out of with three months pay while looking for a new job.

¶ 20. After considering all the pertinent factors, the trial court concluded that reliance damages, rather than expectation damages, would be appropriate in this case. The trial court conducted an evidentiary hearing to afford Tynan an opportunity to prove any reliance damages he suffered. As noted, at the hearing, Tynan failed to prove he suffered any reliance damages. As the trial court stated in its order following the damage hearing:

> If Mr. Tynan could show to a reasonable degree of certainty that he would have pursued some particular other employment and have been better for it, then JBVBB should pay him the difference, as a consequence of having made the promises on which Mr. Tynan relied. However, if a superior alternative did not exist, or if the superiority of the alternative cannot be proven with reasonable certainty, then it cannot be said that Mr. Tynan suffered for choosing the path that led to JBVBB.
>
> ... Despite considerable reflection, I cannot discern with certainty from the evidence before me what path Mr. Tynan would have chosen, or whether he would have been better off. Long have I stood, so to speak,

looking as far as I could down the alternative paths that Mr. Tynan suggests were available to him, but they are either dead-ends or they bend into the undergrowth before it can be clear to anyone whether they would have led to riches beyond what Mr. Tynan earned for his efforts at JBVBB. In short, Mr. Tynan's proof fails to persuade me that he could have done better than he did at JBVBB.

¶ 21. The trial court went on to make the following findings of fact: (1) In late July 1999, JBVBB hired Tynan as a consultant, paying him $1500 per day and Tynan worked approximately nine days a month; (2) Tynan agreed to come work for JBVBB as a full-time employee and based on promises Lee made, Tynan moved his family to Milwaukee; (3) Tynan began working full-time for JBVBB in November 1999 without a long-term contract; he was being paid under an interim arrangement, receiving $200,000 per year plus some but not all benefits he was trying to negotiate; (4) this opportunity came at the right time for Tynan as he was tired of the consulting work and wanted to work for a single employer; (5) substantial differences prevented Tynan and Lee from ever agreeing to an employment contract; (6) in early 2000, JBVBB became dissatisfied with Tynan's work and by summer of 2000, it should have been clear to Tynan that his services were no longer wanted; and (7) after leaving JBVBB, Tynan took a position at Gates City Steel in his home town at an income significantly lower than what he was paid at JBVBB because he did not want the stress of another job hunt.

¶ 22. The trial court went on to address the three potential alternatives that Tynan presented he could have chosen instead of staying at JBVBB based on the promises Lee made. There were three: (1) Tynan

might have held out for a long term contract with JBVBB that would have included certain severance and health benefit continuation provisions; or (2) he might have continued consulting for JBVBB and then looked for consulting work elsewhere, for example, at Union Bank or MI Industries; or (3) he might have consulted for and then taken full-time employment at MI Industries. The trial court concluded, and we agree, that none of these alternatives provided sufficient certainty. Each was speculative and not a sure thing. The first alternative, as noted by the trial court, would never have occurred: "The differences between the parties were substantial and I do not find any evidence from which I can infer that either party was willing to compromise."

¶ 23. The second alternative was not a likely probability for two reasons. First, Tynan was trying to get out of the consulting business. Second, even if Tynan did elect a consulting job, there is no evidence demonstrating that he would have made as much money as he did at JBVBB. The trial court found Tynan's suggestion that he could have made $30,000 a month consulting instead of the $18,000 a month he was paid by JBVBB to be incredible. First, there is no evidence that either of the companies referred to needed a consultant for twenty days a montheven JBVBB used Tynan only nine days a month when he consulted for them. Second, the evidence submitted by Tynan from MI Industries was not sufficiently detailed.

¶ 24. Finally, with respect to the third alternative, the trial court found the evidence inconsistent and insufficient. MI Industries was not able to provide any specific evidence as to the timing in which it hired other consultants other than saying it was between 1999 and 2000. In addition, the principal of MI Industries was a

friend of Tynan, as Tynan and his brothers are investors in MI Industries. Thus, the principal of MI Industries was not impartial.

■

¶ 25. Based on the foregoing, we agree with the trial court that Tynan failed to identify a competing opportunity that was clearly made available to him, but deliberately was spurned in reliance on the defendant's promise. Moreover Tynan failed to demonstrate that a reasonably likely alternative could have been pursued or that there is a sufficient likelihood that he could have done better by consulting or working for MI Industries. Accordingly, Tynan failed to satisfy his burden of proving that he suffered detrimental reliance based on the promises made.

¶ 26. We conclude that the trial court did not err in determining that the facts and circumstances of this case resulted in a conclusion that reliance damages were the appropriate remedy. Reliance damages would be the remedy that was just in this case. However, we further conclude that the trial court did not err in determining that Tynan failed to prove that he suffered any reliance damages. Accordingly, we affirm the judgment of the trial court.

*By the Court.*—Judgment affirmed.

¶ 27 FINE, J. (*dissenting*). In my view, this case is governed by *Skebba v. Kasch,* 2006 WI App 232, 297 Wis. 2d 401, 724 N.W.2d 408, which was decided after the trial court entered the judgment from which Joe Tynan appeals. The trial court's analysis, which the Majority seems to adopt *in toto,* was, therefore not guided by *Skebba.* Although the Majority cites *Skebba,* it ignores its teaching. Accordingly, I respectfully dissent.

¶ 28. The crux of this case is the jury's verdict. As the Majority recognizes:

> The jury found that in late October 1999, Lee promised Tynan that if he came to work for JBVBB full time, he would be paid an incentive bonus and an equity growth bonus and that if his employment was terminated, he would be entitled to the continuation of his salary and benefits for a period following termination. The jury also found that in reliance upon Lee's promise, Tynan decided to go to work for JBVBB and move his family from Lincoln, Nebraska to Milwaukee.

Majority, ¶ 7. Thus, the jury found that Tynan did things (agreed to work for JBVBB full time, which required him to move to Milwaukee from Nebraska) *because* he was promised three things: (1) an incentive bonus; (2) an equity-growth bonus; and (3) if he was fired, his salary and health benefits for, as phrased by the verdict, "a period of time." Significantly, in light of *Skebba,* none of these promises, upon which the jury found Tynan relied, were tied to any other element of Tynan's income, his ability to find other work, or anything else—*the promises* were the *quid pro quo* for Tynan's move to Milwaukee and agreement to work for JBVBB.

¶ 29. Just as in *Skebba,* where the employer, Jeffrey C. Kasch, d/b/a M.W. Kasch Co., "enjoyed the fruits of Skebba's reliance," 2006 WI App 232, ¶¶ 12, 14, 297 Wis. 2d at 411, 413, 724 N.W.2d at 412, 413, JBVBB enjoyed the fruits of Tynan's reliance. He is, as was Skebba, entitled to receive JBVBB's "specific performance promised"—his incentive bonus, his equity-growth bonus, and his salary and health benefits—all neither defeated nor reduced by the considerations applied by the trial court. *See ibid.* ("[T]o prevent injustice, the equitable remedy for Skebba to receive is

540

Kasch's specific performance promised—payment of the $250,000" unreduced by anything else because "Skebba's loss has nothing to do with what he might have earned on another job. Income from the rejected job was never a part of the calculus of the promise made and relied upon.").

¶ 30. I would remand to the trial court to determine the dollar value of the three things JBVBB promised Tynan but never gave him.