VIKING PACKAGING TECHNOLOGIES, INC.
f/k/a Leonhard Packaging Solutions, Inc.,
Plaintiff-Respondent,

v.

VASSALLO FOODS, INC.
d/b/a Country Pasta,
Defendant-Appellant.

Court of Appeals

*No. 2010AP2067. Submitted on Briefs May 3, 2011.
—Decided August 9, 2011.*

2011 WI App 133

(Also reported in 804 N.W.2d 507.)

125

On behalf of the defendant-appellant, the cause was submitted on the briefs of *William P. Te Winkle* and *Stephanie E. Waldon* of *Rohde Dales LLP*, Sheboygan.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Sean Lanphier* and *Andrew Robinson* of *Mallery & Zimmerman, S.C.*, Madison.

Before Curley, P.J., Kessler and Brennan, JJ.

¶ 1. KESSLER, J.   Vassallo Foods, Inc. d/b/a Country Pasta ("Country Pasta") appeals the trial court's judgment in favor of Viking Packaging Technologies, Inc. ("Viking") and an order dismissing its counterclaims. Country Pasta contends that the trial court erred in granting judgment in favor of Viking and in dismissing its counterclaims because: (1) Viking breached its contract with Country Pasta by failing to

complete installation of a complete packaging system and (2) Country Pasta did not accept the tin-tie applicator or the accompanying conveyor that was a part of the packaging system. Country Pasta alternatively argues that if a determination is made that it did accept the packaging system, it revoked the acceptance. We disagree and affirm the trial court.

## BACKGROUND

¶ 2.   Viking commenced this action against Country Pasta seeking damages in the amount of $34,110.22 for unpaid products and services provided by Viking under its contract with Country Pasta to provide Country Pasta with a product packaging system. Country Pasta, located in Polson, Montana, is in the business of making noodles. Viking is a Wisconsin corporation and manufactures, fabricates, and services industrial packaging equipment. In 2006, Gary Ivory, the production manager at Country Pasta, contacted Robb Leonhard, one of the owners of Viking, to discuss a quotation for a more automatic pasta bagging system. Specifically, Country Pasta wanted a system in which the pasta bags would be weighed more accurately and in which the bags would be closed or tied more automatically. Ivory provided Leonhard with a sample of Country Pasta's product in the bag it was using at the time and indicated what he wanted the product to look like. Leonhard then sent Ivory photographs of a bag of Country Pasta's product with a tin-tie on it and stated "this is basically what your look is going to be." Viking included the photographs on the second page of the quotation.

¶ 3.   On July 13, 2007, Country Pasta accepted Viking's quotation to purchase a pasta packaging system. The quotation provided pricing for a packaging

system consisting of a Viking M400 bagger (the "bag-ger"), a Weigh Right PMB-3 Net Weigh filling machine (the "scale"), a tin-tie applicator and its transition conveyor. The quotation shows photos of the equipment and of Country Pasta bags closed with a tin-tie. The items related to the tin-tie applicator were priced at $47,173. The total purchase price for the product packaging system was $178,074.

¶ 4.   The quotation, found by the trial court to be a contract, called for a "checkout," or a pre-shipment inspection, by Country Pasta "prior to shipment." In April 2008, Country Pasta sent Ivory and Scott Knutson to Viking's facility in Kohler, Wisconsin to perform the checkout of the packaging system. Viking demonstrated the operation for Country Pasta's employees. The tin-ties on the finished bags did not regularly close up during this demonstration; however, Viking worked on the packaging system, and told Country Pasta that the system was "working better." Country Pasta approved the shipment and the packaging system was delivered to Country Pasta before June 17, 2008. Ivory helped unpack and set up the equipment; he did not notice any defects.

¶ 5.   The contract provided that "if requested by the customer, [Viking] will provide a service technician for installation of the quoted equipment." The contract did not include free installation, but estimated that two days of installation and training for Country Pasta employees would cost $3373. The contract also provided that "[a]n installation will be considered complete when all systems purchased from [Viking] perform per the Product Performance Specifications." "Product Performance Specifications" are not defined in the contract.

¶ 6.   From June 17, 2008, through June 25, 2008, Viking technician Tim Parrish worked on installing the

equipment and training Country Pasta's employees in Montana. During this visit, Parrish discovered that Country Pasta workers would drop or tap bags full of pasta on a table in order to settle the noodles to allow for a twist tie to be applied to the bag. Parrish made adjustments to the machinery, including adding a shelf to assist in the settling of the noodles. Despite these efforts, the tin-tie applicator was not functioning properly at the time he left. Viking and Country Pasta agreed to split the cost of a second visit by Parrish.

¶ 7. Parrish returned to Country Pasta in July 2008 with Steve Almberg, a representative from Weigh Right, the manufacturer of the scale. Parrish and Almberg improved the operation of the scale and bagger by making modifications to Country Pasta's equipment feeding the scale and bagger. Almberg discovered the scale was not being operated correctly because it had no automatic control, however there were no actual problems with the scale itself.

¶ 8. Parrish attempted to make the tin-tie applicator work with Country Pasta's product by using a heavier gage tin-tie. Parrish presented a bag with a tin-tie to Fred Kellogg, owner of Country Pasta, who Parrish said was dissatisfied with the tin-tie's ability to keep the bag closed during handling. Parrish informed Kellogg that the tin-tie applicator would not work on Country Pasta's product. A Country Pasta memorandum regarding a meeting with Parrish on July 10, 2008, notes the improvements with the scale and bagger, but states that "[t]here is no way the current tin-tie system will work with our product." Parrish did no further work on the tin-tie applicator and left Montana. Parrish was not asked to return to Montana by Kellogg to continue working on the applicator.

131

¶ 9.   On December 4, 2008, five months after delivery of the packaging system, and four months after Parrish's final visit, Kellogg sent an email to Viking stating that Country Pasta wanted a refund for the tin-tie applicator and the associated conveyor in the amount of $47,173. At that time, Country Pasta had outstanding invoices due to Viking in the amount of $34,110.22. Viking brought suit against Country Pasta, seeking the outstanding amount. Country Pasta counterclaimed, alleging breach of contract. Country Pasta's first objection to the Viking invoices was made in its answer to Viking's complaint.

¶ 10.   After a trial to the court, judgment for money damages was entered in favor of Viking on its contract claim against Country Pasta. In addition, an order was entered dismissing Country Pasta's counterclaim alleging breach of contract by Viking, and alleging Country Pasta's revocation of acceptance of the tin-tie applicator and conveyor. Country Pasta now appeals.

## DISCUSSION

¶ 11.   Country Pasta contends that the trial court erred in granting judgment in favor of Viking and in dismissing its counterclaims because: (1) Viking breached the contract by failing to complete installation of the packaging system; (2) Country Pasta did not accept the tin-tie applicator; and (3) if Country Pasta did accept the packaging system, it revoked acceptance. We disagree.

## I.   Standard of Review.

¶ 12.   "The interpretation of a written contract is a question of law that we review *de novo*." *Tang v.*

*C.A.R.S. Prot. Plus, Inc.*, 2007 WI App 134, ¶ 27, 301 Wis. 2d 752, 734 N.W.2d 169. "Findings of fact by the trial court will not be upset on appeal unless they are against the great weight and clear preponderance of the evidence." *Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 249, 274 N.W.2d 647 (1979). "Whether the facts . . . fulfill a particular legal standard is a question of law which we review de novo." *See Ide v. LIRC*, 224 Wis. 2d 159, 166, 589 N.W.2d 363 (1999). The most common questions of law involve the application of a statute to a particular set of facts. *See, e.g., State v. Piddington*, 2001 WI 24, ¶ 13, 241 Wis. 2d 754, 623 N.W.2d 528. Because the contract between Viking and Country Pasta involves the sale of goods, we apply Wis. Stat. ch. 402 (2009–10),[1] relating to the sale of goods, to this transaction.

## II. Breach of Contract.

¶ 13. Country Pasta contends that Viking breached its contract by failing to complete installation of the entire packaging system because the tin-tie applicator did not consistently put tin-ties on its pasta bags in accordance with the product performance specifications mentioned in the contract. Country Pasta asserts that because the tin-tie applicator would not *consistently* apply the tin-ties to Country Pasta's product, "*a component of the system* did not perform according to the product performance specifications." (Emphasis added.) Although Country Pasta makes no complaint about the performance of the bagger, the scale, or their related conveyors, it argues that Viking failed to complete "installation of *the entire [p]ackaging [s]ystem*" and therefore breached its obligations under the contract. (Emphasis added.)

---

[1] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

¶ 14. The contract required Viking to install the packaging system if, and only if, Country Pasta requested that service and agreed to pay for that service at the rates set out in the contract.[2] The trial court found that the parties agreed to two visits by a Viking technician—Parrish. After Parrish told Country Pasta at the end of his second visit in July 2008, that the tin-tie applicator would not work with its product, Kellogg never requested further installation or other work by Viking. Kellogg never asked to have the applicator replaced, nor did he identify any defective or broken parts. All of these alternatives were available to Country Pasta under the contract.[3]

¶ 15. The contract says installation "will be considered complete when all systems purchased from [Viking] perform per the Product Performance Specifications"; however, the contract does not define such specifications, making it ambiguous. Apparently relying substantially on the photographs sent by Leonhard to Ivory to establish the meaning of "[p]roduct [p]erformance [s]pecifications," the trial court found that because "the machine did not consistently place the tin-tie on the bag in a closed position[,]" there was a "failure to complete installation . . . [of] a component of the sys-

---

[2] The contract provides: "[Viking] *if requested by the customer,* will provide a service technician for installation of the quoted equipment . . . under the following [Viking] Installation, Service, and Training Rates (or actual rates in force at the time of installation.)[.]" (Emphasis added; some formatting altered.)

[3] The contract provides: "Conditions of Sale: ... GUARANTEE. [Viking] and Weigh Right guarantee all parts and equipment manufactured by [Viking] and Weigh Right for twelve months from customer receipt . . . . *This guarantee is limited to the replacement of broken or defective parts . . . .*" (Emphasis added.)

tem" and the system "did not perform according to the product performance specifications."

¶ 16.  The trial court found specifically that Country Pasta wanted its packaging system to be more automatic. It wanted to have the "bags closed or tied and the bags to be weighed more accurately." Nothing in those photographs, or elsewhere in the contract, establish how quickly the packaging system was required to function. By the end of his second visit to Country Pasta, Parrish testified he was able to give Kellogg a package closed with a tin-tie, but Kellogg was dissatisfied because of the way the tin-tied bag performed during handling. Kellogg himself testified that he thought the bags looked "sloppy." Nothing in the contract even hints at any handling standards the tin-tie must withstand. The record does not explain how the "look" of the bag delivered differed from the photographs attached to the contract. Country Pasta has not established that the packaging system as a whole, or the tin-tie applicator specifically, failed to meet any identifiable "[p]roduct [p]erformance [s]pecifications."

■

¶ 17.  Country Pasta failed to establish a breach of contract by Viking. The trial court properly dismissed Country Pasta's counterclaim based on breach of contract.

### III.  Acceptance.

■

¶ 18.  Country Pasta argues that the trial court erred in finding that County Pasta accepted the tin-tie applicator and its related conveyor because without a complete installation, Country Pasta never had a rea-

sonable opportunity to inspect the packaging system. Installation was required under the contract only if requested by Country Pasta. The predominant purpose of the contract was the sale of the packaging system. Consequently, WIS. STAT. ch. 402, relating to sale of goods, applies to this transaction.

¶ 19. WISCONSIN STAT. § 402.606(1)[4] describes buyer conduct which establishes the acceptance of goods. Acceptance occurs when the buyer: (1) "signifies to the seller" that the goods are nonconforming, but will be retained in spite of the failing; (2) when goods are not rejected after a reasonable opportunity to inspect them; or (3) when the buyer does anything inconsistent with the seller's ownership. *Id.*

¶ 20. As our supreme court explained in *Gerner v. Vasby*, 75 Wis. 2d 660, 668, 250 N.W.2d 319 (1977):

Acceptance is the unilateral act of the buyer alone, or of his representative; it requires no action or expression on the part of the seller. Acceptance within the meaning

---

[4] The full text of WIS. STAT. § 402.606 provides:

**What constitutes acceptance of goods. (1)** Acceptance of goods occurs when the buyer:

(a) After a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that the

(continued)

buyer will take or retain them in spite of their nonconformity; or

(b) Fails to make an effective rejection (s. 402.602(1)), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) Does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by the seller.

**(2)** Acceptance of a part of any commercial unit is acceptance of that entire unit.

of the statute is an expression of assent by the buyer to become the owner of specific goods as the subject matter of the contract made by him with the seller.

(Quotation marks and citation omitted.)

■■

¶ 21. WISCONSIN STAT. § 402.606(2) provides that "[a]cceptance of *a part* of any commercial unit is acceptance of *that entire unit.*" (Emphasis added.) A "commercial unit" is defined by WIS. STAT. § 402.105(1)(a) as:

a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use. A commercial unit may be a single article (as a machine) or a set of articles (as a suite of furniture or an assortment of sizes) or a quantity (as a bale, gross, or carload) or any other unit treated in use or in the relevant market as a single whole.

¶ 22. Accordingly, we must first determine whether the contract involved the packaging system as "a single whole," or as the separate purchase of the bagger, scale, tin-tie applicator and some conveyors, before determining whether Country Pasta accepted the packaging system. The purchase of a "packaging system" composed of multiple single machines is very similar in concept to the statutory example of "a suite of furniture or an assortment of sizes." *See id.* Both the hypothetical suite of furniture and the packaging system would be materially impaired in their value to the user if parts (a chair, a tin-tie applicator) were removed from the whole.

¶ 23. The title page of the contract itself describes a "quotation to package pasta." If the contract were simply to buy multiple distinct machines, this description would be unnecessary. The contract then summa-

137

rizes the proposal as "for a Viking M400 with a smooth, dependable stepper motor jaw and a Weigh Right PMB-3 Net Weigh filling machine designed for filling 1 lb. to 4 lbs. of egg noodles into bags." Below that summary, a photograph of connected packaging line machinery and conveyors is captioned "Viking M400 with tin-tie applicator and discharge conveyor."[5] If the contract were simply to buy multiple distinct machines, this description and photo would be unnecessary. The Weigh Right scale could have been purchased by Country Pasta directly from Weigh Right. There would be no point in Viking including another manufacturer's scale in its quotation unless Country Pasta intended to purchase, and Viking intended to sell, an integrated packaging system. The contract separately provides the technical data for each of the three large machines included in the contract, but this is in no way inconsistent with the intent to furnish an integrated packaging system. The prices for the bagger, tin-tie applicator, scale, and estimated installation/training time are separately set out, but are totaled for both the equipment ($178,074) and for the equipment and estimated installation costs ($181,447). If the contract intended to offer to sell three unrelated machines, there would be no point in providing total costs for the machinery, and little reason to estimate as one item the estimated cost of installing all of the machines. Finally, as part of the "Conditions of Sale," the parties agreed that "No claim under the Quotation in respect of only part of any delivery shall entitle the buyer to cancel the remainder of any order of which such delivery formed a part." This provision follows the substance of WIS. STAT. § 402.606(1)(a) and

---

[5] The Weigh Right machine was apparently not present in Viking's plant at the time the photograph was taken.

138

(2) and would only be necessary if an integrated packaging system was the subject of the contract. If the contract contemplated separate purchases of distinct machines, delivery of each would complete each "order" and there would be no "remainder" of the order to be considered. Thus, we conclude that the commercial unit here, as understood by the parties in their contract, is the entire integrated packaging system.

¶ 24.  Case law supports our conclusion that Country Pasta purchased an integrated packaging system. In *Badger Produce Co., Inc. v. Prelude Foods International, Inc.*, 130 Wis. 2d 230, 387 N.W.2d 98 (Ct. App. 1986), we concluded that two orders of 500 boxes of frozen crab constituted a single commercial unit within a 1000 box shipment. *Id.* at 239. Thus, the buyer could accept five hundred boxes without accepting the balance. *Id.* In *Badger Produce*, the unit of sale to a retail customer was a single "lot" of frozen crab consisting of 500 boxes, *id.* at 233, although obviously a customer might choose to purchase more. Each box of crab was presumably the same as every other box.

¶ 25.  In this case, however, unlike the "lot" units of frozen crab, the contract provided for the sale of a packaging unit consisting of multiple large and very different machines, conveyors that move the product between them, and various switches, pipes, bolts and so forth, which connect and provide sequential functioning of the component parts. The purpose of these various machines, in this contract, is to function as an integrated commercial unit—an automated packaging system. We conclude that Viking quoted, and Country Pasta ordered and received, an integrated packaging system.

¶ 26.  By the time Parrish left Montana in July 2008, Country Pasta was dissatisfied only with the performance of the tin-tie applicator. The other ma-

chines comprising the packaging system apparently functioned satisfactorily. Country Pasta expressed no intent to return the bagger, the scale, or the other equipment related to the operation of those machines. Earlier, after its "checkout" of the system and knowledge that there had been problems with the tin-tie applicator, Country Pasta approved of the shipment of the packaging system. No defective or broken parts were identified when Country Pasta unpacked and set up the machines. Country Pasta employees participated in installation and training sessions. Ultimately, Kellogg was informed that the tin-tie applicator would not work with Country Pasta's product, yet he retained the applicator for an additional four or five months before making a complaint. Country Pasta had a reasonable opportunity to inspect the system. It accepted the system as a whole, as it did not wish to return any equipment other than the tin-tie applicator.

¶ 27.    By retaining all of the items in the contract, Country Pasta treated the packaging system in a way that was inconsistent with the seller's ownership. This conduct constitutes acceptance of goods pursuant to WIS. STAT. § 402.606(1)(c). *See Dunck Tank Works, Inc. v. Sutherland*, 236 Wis. 83, 85–87, 294 N.W. 510 (1940) (keeping and using storage tanks when buyer ordered pressurized tanks is inconsistent with seller's ownership); *Fox v. Wilkinson*, 133 Wis. 337, 341–42, 113 N.W. 669 (1907) (use of an engine after giving notice that the engine was unacceptable is inconsistent with the seller's interest); *and J. B. Bradford Piano Co. v. Baal*, 166 Wis. 134, 136, 164 N.W. 822 (1917) (By retaining a piano for three months with the knowledge of the defects, and by making payments, the buyer waived the defects.).

¶ 28.   The only conduct in this record that might arguably be considered a notice of rejection is an email dated December 4, 2008, from Kellogg to Viking, demanding a refund of the cost of the tin-tie applicator. To reject goods, however, WIS. STAT. § 402.602(1)[6] requires that the rejection occur within a reasonable time after delivery, and the rejection only becomes effective when the buyer "seasonably notifies the seller." *See Smyser v. Western Star Trucks Corp.*, 2001 WI App 180, ¶ 19, 247 Wis. 2d 281, 634 N.W.2d 134 (A truck purchaser who experienced problems almost immediately, but used the vehicle for eighteen months before transferring it back to the dealer, did not reject the vehicle in a timely manner under the Uniform Commercial Code.). Kellogg's email was sent four months after Parrish's second visit to Montana, in which Parrish indicated that the tin-tie applicator would not work with Country Pasta's product. Country Pasta never rejected the commercial unit.

## IV.   Revocation of acceptance.

¶ 29.   Country Pasta finally argues that if it accepted the packaging system, it was done with the assumption that "Viking was continuing to work on a solution to fix the tin-tie applicator" after Parrish left Montana in July 2008. Country Pasta argues that it

---

[6] WISCONSIN STAT. § 402.602(1) provides: "[r]ejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller."

revoked acceptance upon Kellogg's realization that "Viking was not going to provide a solution." We are not persuaded.

■

¶ 30. WISCONSIN STAT. § 402.608(1)(a) and (2) describe the revocation of the acceptance of goods.[7] The buyer may revoke acceptance "of *a lot or commercial unit* whose nonconformity substantially impairs its value to the buyer" when the buyer has accepted the goods "[o]*n the reasonable assumption that its nonconformity would be cured* and it has not been seasonably cured." WIS. STAT. § 402.608(1)(a). (Emphasis added.) The revocation must occur "within a reasonable time after the buyer discovers . . . the ground [for revocation] and . . . is not effective until the buyer notifies the seller" of the revocation. WIS. STAT. § 402.608(2). Ordinarily, what constitutes a reasonable time is a question

---

[7] The full text of WIS. STAT. § 402.608 provides:

**Revocation of acceptance in whole or in part. (1)** The buyer may revoke the buyer's acceptance of a lot or commercial unit whose nonconformity substantially impairs its value to the buyer if the buyer has accepted it:

(a) On the reasonable assumption that its nonconformity would be cured and it has not been seasonably cured; or

(b) Without discovery of such nonconformity if the buyer's acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

**(2)** Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

**(3)** A buyer who so revokes has the same rights and duties with regard to the goods involved as if the buyer had rejected them.

of fact for the factfinder. *Wilson v. Tuxen*, 2008 WI App 94, ¶ 40, 312 Wis. 2d 705, 754 N.W.2d 220.

¶ 31.   Country Pasta knew when its technicians did their "checkout" of the tin-tie applicator in Viking's plant that the machine did not function satisfactorily on Country Pasta bags. When all of the machines arrived in Montana in June 2008, and were installed in the Country Pasta plant, Country Pasta could see that the problem had not been fixed. Parrish came to instruct employees and assist with installation. Country Pasta knew that Parrish had not been able to fix the problem when he left in June because Country Pasta agreed to pay for half of his cost to return and try again. Country Pasta knew in July 2008 that the problem it perceived with the tin-tie applicator continued because Parrish told Country Pasta the machine would not work on Country Pasta's product. Because the seller's agent made repeated repairs to a machine at the buyer's request and the machine still did not work as the contract required, the buyer knew, or should have known that the machine would not do good work, and could not be made to do good work. *See Wood Mowing & Reaping Mach. Co. v. Calvert*, 89 Wis. 640, 643–45, 62 N.W. 532 (1895).

¶ 32.   The trial court found that when Parrish "told [Country Pasta's] employees that the tin-tie applicator would not work, that certainly . . . was an indication . . . that there was not going to be additional work done." The trial court also found that "there was no evidence presented at trial as to any further discussion of [additional work]." Thereafter, as the trial court found, Country Pasta "could not reasonably assume that the nonconformity of the machinery would be cured." These findings make revocation under Wɪs. Sᴛᴀᴛ. § 402.608(1)(a) and (2) unavailable to Country Pasta.

## CONCLUSION

¶ 33.   We conclude that Country Pasta accepted the packaging system when it was delivered to the Country Pasta plant and Country Pasta noted no defects in the equipment. *See* Wis. Stat. § 402.606. Thereafter, Viking twice responded to Country Pasta's requests for installation assistance. When Viking told Country Pasta the tin-tie applicator could not be made to perform as Country Pasta wished, Country Pasta never requested further assistance from Viking and thus could not have reasonably believed Viking was making further efforts to resolve the problem.

¶ 34.   Country Pasta made no effort at any time to revoke its earlier acceptance of the entire package under Wis. Stat. § 402.606(1)(c). Instead, four or five months after Country Pasta was told that the tin-tie applicator could not be made to perform to Country Pasta's satisfaction, Country Pasta attempted to revoke its acceptance of only that part of the commercial unit. Such partial revocation of acceptance of a commercial unit is barred under Wis. Stat. § 402.608(1)(a) and (2). Viking did not breach this contract and Country Pasta's counterclaims were properly dismissed.

*By the Court.*—Judgment and order affirmed.