COURT OF APPEALS
DECISION
DATED AND FILED

March 24, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2025AP226**

Cir. Ct. No. 2023GN41

STATE OF WISCONSIN

IN COURT OF APPEALS
DISTRICT III

IN THE MATTER OF THE GUARDIANSHIP OF J. T. B.:

P. B.,

PETITIONER-RESPONDENT,

V.

J. T. B.,

RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Marathon County: SUZANNE C. O'NEILL, Judge. *Affirmed*.

Before Stark, P.J., Hruz, and Gill, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Jerry[1] appeals orders granting petitions filed by Penny, his adoptive mother, for guardianship of his person and estate, pursuant to WIS. STAT. ch. 54 (2023-24),[2] and for protective placement, pursuant to WIS. STAT. ch. 55. Jerry argues that Penny presented insufficient evidence to satisfy the requirements for both a guardianship and protective placement. We reject Jerry's arguments and affirm.

## BACKGROUND

¶2 On July 21, 2023, Penny filed petitions for temporary and permanent guardianship of Jerry's person and estate and for protective placement. Both petitions alleged that Jerry had, among other things, schizophrenia and a drug addiction; that Jerry's schizophrenia and drug addiction required him to be in a residential group home; that Jerry had a history of noncompliance with medications; and that Jerry was a danger to himself and potentially to others. At the time the petitions were filed, Jerry was also subject to a WIS. STAT. ch. 51 commitment order. Following a hearing, the circuit court issued an order for a temporary guardianship of Jerry's person and estate.

¶3 On September 14, 2023, the circuit court held a final hearing on the petitions. Penny testified that she adopted Jerry, then 36 years old, when he was 3 months old and that he had mental health problems throughout elementary and high school, for which he received treatment. Penny also testified that Jerry began using illegal drugs in high school and that he had tried marijuana, LSD, cocaine,

---

[1] For ease of reading, we refer to both the appellant and the respondent in this confidential matter using pseudonyms, rather than their initials.

[2] All references to the Wisconsin Statutes are to the 2023-24 version.

and methamphetamine. Penny added that Jerry would use these drugs while also taking prescribed psychotropic medications.

¶4 Penny also stated that she visited Jerry the day before the hearing and that within 15 to 30 seconds of conversing with him, he "went off into one of his delusions." She testified that Jerry told her he had killed the director of a film "by hitting him in the private parts," "that there were more people that would deserve it," and that he then began mumbling. Penny also described Jerry's belief that he had record deals with Best Buy and Walmart and what his plans were "when he gets big money" from those companies.

¶5 Carl Peterson, a case manager for North Central Health Care, testified that he had been working with Jerry intermittently for eight to ten years. Peterson stated that Jerry's main diagnosis, which he was working to treat, was paranoid schizophrenia and that Jerry also had a substance abuse disorder. Peterson testified that Jerry actively used recreational drugs while Peterson worked with him, including marijuana and methamphetamine, and that Jerry used drugs while taking his psychotropic medication. Peterson stated that he first began working with Jerry when Jerry lived in a supported apartment with on-site staff, and, during that time, he observed "paraphernalia, empty pipes, empty bongs, multiple burn holes … on the bed, mattress, probably over a hundred burn holes in the carpet."

¶6 Peterson testified that Jerry was ultimately evicted from the supported apartment and then lived at different places, but those places would each evict Jerry due to his failure to maintain them. Peterson added that Jerry would allow other homeless individuals to reside with him, and those individuals took advantage of Jerry. For example, Peterson stated that Jerry purchased several

items that Peterson believed were taken from Jerry by others without Jerry's knowledge and which were sold, because Peterson was not sure where those items "end[ed] up." Peterson further stated that doors and windows were left open at the apartment and that people "were coming and going from the apartment."

¶7 Peterson further testified that Jerry had missed appointments, primarily with his psychiatrist, and that many of those appointments had to be rescheduled. As to Jerry's medication, Peterson testified that Jerry recently had a change in medication, that Jerry was improving, but that Peterson did not "see [the new medication] completely helping him fully yet." He added that even with routine treatment, such as injectables "to get the most help," Jerry's problems persisted.

¶8 Peterson also testified about the circumstances that led to Jerry's most recent WIS. STAT. ch. 51 commitment, stating that Jerry had active symptoms, that he was homeless at the time, that Jerry's homelessness made it difficult to locate him so he could receive and take his medications, and that he was missing appointments with his psychiatrists. As to whether Jerry could be successful if he were independent, Peterson opined that he "would question if an apartment would be successful at this time," given that Jerry could not safely care for himself when he lived by himself. Peterson explained that when Jerry was evicted, Peterson attempted to help Jerry find alternative housing, but Jerry did not meet with the landlord or fill out an application, and Jerry's previous attempts at living by himself were unsuccessful because people were coming and going from the apartment. Peterson added that when Jerry lived by himself in an apartment, Peterson worried whether the apartment would burn down due to Jerry's substance abuse because Jerry could not make conscious decisions while under the influence of drugs.

¶9      Peterson then testified that Jerry's behaviors would present a risk of harm to Jerry if Jerry used drugs, if Jerry's mental health were unstable, or if there were not a "higher level of housing assistance support." Peterson noted several safety concerns he observed when Jerry lived by himself, including the burn holes, clothing in the bathtub, mold in the bathtub, a sink full of fruit flies (and maggots at one point), and the stove "caked with grease that could easily start on fire."

¶10     On cross-examination, Peterson testified that Jerry actively used drugs when he lived alone and that Jerry's drug use impacted the effectiveness of the treatment that he was receiving. Peterson was not aware of a circumstance in which Jerry attempted to live by himself while he was receiving treatment but not using drugs. As to Jerry's property that went missing, Peterson admitted that he did not know whether those items were stolen, given away, or traded.

¶11     Doctor Kayleena Kelly, a clinical psychologist, testified about her examinations of Jerry and her reports of those examinations, which were admitted into evidence. Kelly testified that she examined Jerry twice,[3] spoke with both Penny and Peterson, and reviewed at least eight years of Jerry's medical records. Kelly testified that when she examined Jerry, he was "cooperative and willing to engage" at first, but he requested to leave after about 20 minutes. She further stated that Jerry appeared sober during the examination, but she admitted that he had not been formally tested for substances.

---

[3] Prior to filing the petitions in this case, Penny had previously filed petitions for guardianship and for protective placement for which Dr. Kelly provided a report. Those petitions were dismissed due to a failure to complete the comprehensive evaluation on time. Penny then refiled the petitions, and the refiled petitions are the subject of this appeal.

¶12 Doctor Kelly opined that Jerry had a limited ability to use currency and manage his calendar and that he had difficulty planning ahead and organizing his thoughts "in a way that would help him to be able to manage his schedule on his own." As discussed in more detail below, Kelly testified about Jerry's severe disorientation, his disorganized speech, his severely impaired reasoning, and his lack of executive functioning.[4] She further testified that Jerry's paranoid schizophrenia was unlikely "to clear up or go away"; that it was a permanent diagnosis Jerry would have to deal with for the rest of his life; and that, given Jerry's medical record and "history of difficulties," no treatment had been completely effective at resolving the issues that she believed Jerry dealt with on a daily basis.

¶13 Doctor Kelly further opined that, as a result of his impairment, Jerry could not adequately use any information given to him as part of the decision-making process; that he could not protect himself from abuse, exploitation, neglect, or violation of his rights; and that his inability to do so would always be a part of his life, regardless of treatment plans or medications. She also opined that Jerry would never be able to meet the essential requirements of his health and safety, would be unable to provide for his own support, and would be vulnerable to financial exploitation. She added that less restrictive measures would not eliminate Jerry's need for a guardianship, given that he required a higher level of care with services for his mental illness and with mental health

---

[4] Doctor Kelly explained the concept of executive functioning as a person's ability to plan, organize, and pay attention, and as the "functioning of your frontal lobe where your forgetfulness is, organizing your day, managing a calendar." She agreed that executive functioning included "things such as knowing what decisions one needed to make on a daytime basis to provide for his [or her] basic needs."

professionals who "are trained to help him and understand … his behaviors and what he is going through."

¶14 Doctor Kelly also testified about Jerry's protective placement, which we describe in more detail below. Kelly opined that Jerry had a primary need for residential care and custody, given that Jerry did better with a "structured environment" limiting who can come and go and controlling his access to drugs. She further opined that Jerry's individual capacities render him so incapable of providing for his own care and custody as to create a substantial risk of harm to himself or others, given that he would put himself or others in danger if he were to live independently. Kelly also opined that Jerry's condition was permanent or likely to be permanent.

¶15 Nadine Switlick, the lead social worker for adult protective services at North Central Health Care, testified about Jerry's comprehensive evaluation that she completed and which was admitted into evidence. Switlick testified that she reviewed Jerry's medical records and that she spoke with Peterson, Penny, and staff at North Central Health Care. She opined that guardianship and protective placement could not be used "as a means to keep somebody from doing drugs or to provide treatment."

¶16 In contrast to Peterson's testimony, Switlick testified that Jerry had good hygiene, could take care of himself, and could maintain his home. She explained that staff in the unit where Jerry currently resided told her that Jerry bathes and toilets himself independently, is able to feed himself, and is able to "ambulate himself independently," all of which Switlick identified as skills that an individual needs to live independently. Switlick acknowledged, however, that she had never observed Jerry in an independent setting.

¶17 Switlick opined that guardianship and protective placement were not appropriate for Jerry, and she instead stated that Jerry should be evaluated for the assignment of a supportive decisionmaker or a spendthrift guardianship. Switlick also recommended determining whether Jerry had the capacity to create a power of attorney. She further opined that Jerry should remain independent with the current services he had in place.

¶18 On cross-examination, Switlick testified that when determining whether an individual needs services that are less restrictive than guardianship and protective placement, she looks at the individual's competency level and the individual's level "of being able to meet their daily essential needs and requirements." Upon further cross-examination, Switlick testified that Jerry "knew where shelter was" and "how to get it," knew how to seek medical care when he needed it, and knew how to seek food when he needed it and where to go. She also admitted that she was not qualified to rate Jerry's executive functioning.

¶19 Consistent with her testimony, Switlick's comprehensive evaluation noted that Jerry "ambulates, feeds himself, bath[e]s, dresses, and toilets independently." As for activities that require more complex thinking skills, such as organizational skills, the report noted that Jerry "is independent i[n] some areas and benefits from assistance in others." For example, Jerry could use the bus system or contact someone for transportation, and he could "manage communication with the use of a phone," even though he had a history of often losing his phone. Jerry, however, would benefit from assistance in managing his mail and medications and managing his finances, given that Jerry had a history of using his money for drugs.

¶20 The evaluation also recounted Switlick's three meetings with Jerry. During these meetings, Switlick observed Jerry speaking "to someone who was not in the room," and he was unable to focus on speaking with her. Jerry also told Switlick that he was in a band that had signed a contract with Walmart and that he would be receiving some money from that contract. Switlick also noted that Jerry understood he was diagnosed with schizophrenia and that he took medication for it, but that he believed he did not need medication because it did not help him. She further noted that Jerry stated he would remain at his current facility until he got the money from his record deal with Walmart, but that if he could not stay at the facility, he would be homeless and go to the Salvation Army, as he had in the past.

¶21 The circuit court found that Jerry had a long history of mental health issues coupled with substance abuse issues and that it was undisputed that his diagnosis was paranoid schizophrenia. The court noted that it considered Penny's, Peterson's, Dr. Kelly's, and Switlick's testimony, and, despite Switlick's testimony, it concluded that Penny had met her burden of proof by clear and convincing evidence. Specifically, the court found credible Kelly's testimony regarding Jerry's paranoid schizophrenia and how it affected Jerry's ability to "effectively receive and evaluate information or to make or communicate decisions to such an extent that he is unable to meet his essential requirements for his own personal physical health and safety," and his ability to manage his property and finances "to such an extent that his property could be dissipated in whole or in part and that he is a person who is unable at this time to prevent his own financial exploitation."

¶22 Consequently, the circuit court found that Jerry was incompetent due to his paranoid schizophrenia, and it concluded that the evidence established the

9

need for a guardianship of Jerry's person and estate. It further concluded that the evidence showed that Jerry was a proper subject for protective placement. Thus, the court orally granted the petitions for guardianship and protective placement.

¶23    The circuit court subsequently entered orders for guardianship of Jerry's person and estate and for protective placement. Jerry appeals. Additional facts will be provided below as necessary.

## DISCUSSION

¶24    On appeal, Jerry argues that Penny failed to present sufficient evidence to satisfy the requirements for both a guardianship and protective placement, and, therefore, the evidence did not support the circuit court's conclusion that those requirements were met. A court's guardianship and protective placement determinations present mixed questions of law and fact. *Robin K. v. Lamanda M.*, 2006 WI 68, ¶12, 291 Wis. 2d 333, 718 N.W.2d 38; *K.N.K. v. Buhler*, 139 Wis. 2d 190, 198, 407 N.W.2d 281 (Ct. App. 1987). We will not overturn the court's factual findings unless they are clearly erroneous. *See Robin K.*, 291 Wis. 2d 333, ¶12; *K.N.K.*, 139 Wis. 2d at 198. A court's factual finding is not clearly erroneous "unless it is against the great weight and clear preponderance of the evidence." *State v. Wiskerchen*, 2019 WI 1, ¶17, 385 Wis. 2d 120, 921 N.W.2d 730.

¶25    The party seeking a guardianship and a protective placement has the burden to show by clear and convincing evidence that the statutory requirements are met. *See Walworth County v. Therese B.*, 2003 WI App 223, ¶21, 267 Wis. 2d 310, 671 N.W.2d 377; WIS. STAT. §§ 54.10(3)(a), 55.10(4)(d). Whether the evidence satisfies the standards for both guardianship and protective placement

is a question of law we review de novo. *See **Robin K.***, 291 Wis. 2d 333, ¶12; ***K.N.K.***, 139 Wis. 2d at 198.

## I. Guardianship

¶26 WISCONSIN STAT. § 54.10(3)(a) sets forth the requirements a petitioner must satisfy in order for a court to appoint a guardian of the person and of the estate. A court may appoint a guardian "for an individual based on a finding that the individual is incompetent only if the court finds by clear and convincing evidence that all of the following are true:"

1. The individual is aged at least 17 years and 9 months.

2. For purposes of appointment of a guardian of the person, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that the individual is unable to meet the essential requirements for his or her physical health and safety.

3. For purposes of appointment of a guardian of the estate, because of an impairment, the individual is unable effectively to receive and evaluate information or to make or communicate decisions related to management of his or her property or financial affairs, to the extent that any of the following applies:

   a. The individual has property that will be dissipated in whole or in part.

   b. The individual is unable to provide for his or her support.

   c. The individual is unable to prevent financial exploitation.

4. The individual's need for assistance in decision making or communication is unable to be met effectively and less restrictively through appropriate and reasonably available training, education, support services, health care, assistive devices, a supported decision-making agreement under [WIS. STAT.] ch. 52, or other means that the individual will accept.

Sec. 54.10(3)(a)1.-4. The above determination "may not be based on mere old age, eccentricity, poor judgment, physical disability, or the existence of a supported decision-making agreement" unless "the proposed ward is unable to communicate decisions effectively in any way." Sec. 54.10(3)(b). Here, Jerry argues that Penny failed to show three of the four elements in § 54.10(3)(a).

> *A. The evidence supports the circuit court's conclusion that, due to his impairment, Jerry cannot effectively receive and evaluate information or make or communicate decisions to the extent that he cannot meet the essential requirements for his physical health and safety.*

¶27 Jerry first contends that Penny failed to show that "because of an impairment, [Jerry] is unable effectively to receive and evaluate information or to make or communicate decisions to such an extent that [Jerry] is unable to meet the essential requirements for his physical health and safety." *See* WIS. STAT. § 54.10(3)(a)2. An "impairment" includes a "serious and persistent mental illness," which is defined as

> a mental illness that is severe in degree and persistent in duration, that causes a substantially diminished level of functioning in the primary aspects of daily living and an inability to cope with the ordinary demands of life, that may lead to an inability to maintain stable adjustment and independent functioning without long-term treatment and support and that may be of lifelong duration.

WIS. STAT. § 54.01(14), (30). A serious and persistent mental illness includes schizophrenia, but it does not include "a primary diagnosis … of alcohol or drug dependence." Sec. 54.01(30). Meeting the essential requirements for physical health and safety means performing "those actions necessary to provide the health care, food, shelter, clothes, personal hygiene, and other care without which serious physical injury or illness will likely occur." Sec. 54.01(19).

12

¶28    Citing Switlick's comprehensive evaluation and her testimony, Jerry argues that there was evidence that he could receive information.  For example, Jerry alleges that he understood he had a mental illness that required him to take medication to treat it.  He further contends that Penny failed to show that his "deficits in receiving, evaluating, or communicating decisions" were "so severe that he was unable to meet the essential requirements for health and safety" and that his deficits "were due to his impairment."  Again, citing Switlick's testimony, Jerry asserts that he could seek care and food when he needed it.

¶29    Jerry, however, fails to acknowledge the remainder of the evidence presented at the final hearing and on which the circuit court relied to make its findings.  That evidence supports the court's ultimate determination that because of his paranoid schizophrenia, Jerry "is unable to effectively receive and evaluate information or to make or communicate decisions to such an extent that [Jerry] is unable to meet [the] essential requirements for his … physical health and safety."

¶30    During her testimony, Dr. Kelly noted Jerry's severe disorientation, stating that Jerry was "unaware of why he was in the office, what the evaluation was for, [and] what the result would be," and that he was "unable to explain his diagnosis, his treatment plan, or the purpose of his visit."  She testified that Jerry "frequently look[ed] about the room, seemed to be responding to external stimuli," and was unable to focus on questions.  She further testified that Jerry could not answer questions regarding his background and history or he "would answer them incorrectly or in a way that wasn't relevant to the question being asked."  She also asked Jerry how long he had been in the facility in which he resided, and he responded that it had been two months, but Kelly stated that Jerry had been at the facility for almost a year.

13

¶31     Doctor Kelly also testified about Jerry's disorganized speech, stating that Jerry "would skip from pattern to pattern with no apparent connection between the thoughts" and he "would sort of ramble … on and on, going between topics, with no connection between topics, and no relevance to the process of the evaluation we were in."   Kelly also noted that Jerry's reasoning was severely impaired because he could not explain the process of "what he would want to do if he were to leave or what he does in treatment or how he uses his thought process to make decisions on a daily basis."   As to Jerry's executive functioning, Kelly testified that Jerry had limited insight into his mental health disorders and drug addiction, he failed to understand the nature of his drug addiction and his paranoid schizophrenia, and he was unable "to hypothetically talk through judgment situations."

¶32     Doctor Kelly also provided several examples of Jerry's delusions due to his paranoid schizophrenia.  She described one in which Jerry explained to her that he was in a musical band, that he had record deals with Walmart and Best Buy, and that he would use the money from those deals to purchase a new home.  She also recalled Jerry telling "fantastical stories about his father and his abilities and that he had I think killed John Lennon at some point and then went on about the yellow flowers and how that related to his father."   Jerry also told her that he had suffered a stroke and that he had treated it with recreational drugs, but Kelly stated that Jerry's medical history did not show that he had a stroke.

¶33     Doctor Kelly diagnosed Jerry as suffering from paranoid schizophrenia and opined that his mental illness was permanent—i.e., something that Jerry would have to deal with for the rest of his life.  She noted that numerous treatments attempted for Jerry had "been effective in improving [his] mood at times," but that none of the treatments had "been effective at completely

resolving" Jerry's issues or the significant concerns that she believed Jerry struggled with daily. She further explained that it is "very difficult to treat delusions and delusional thinking" because "[t]here has been no medication or therapy to date that is effective in treating delusional-type thinking." Although there is the possibility of a more effective medication or therapy for delusional-type thinking at some point in the future, Kelly testified that at this point in time, "it's not going to get better."

¶34 Doctor Kelly further opined that "even with his treatment and on the days he is doing well, [Jerry] continues to have persistent delusions and … his decision[-]making capacity is not within reality." In other words, Jerry could have "good days where he can appear to make fairly good decisions," but those behaviors that affect his thinking and judgment would continue to present a risk for him for the rest of his life.

¶35 The circuit court found credible Dr. Kelly's above testimony and, based on that testimony, found that Jerry's paranoid schizophrenia was a persistent and permanent mental illness that would always impact Jerry's life and lifestyle, even though its symptoms could be managed through treatment and medication. The court specifically noted Kelly's testimony that Jerry's illness impacts his life in such a way that he is unable to manage his own personal health and safety, as well as his own personal property, given that his illness severely impairs his ability to complete any logical judgments, his ability to reason, his insight, and his ability to organize his thoughts. The court also noted Kelly's testimony that although Jerry "might be able to make a decision when confronted with a specific decision and specific choices," he lacks the executive functioning to "recognize really when a decision needs to be made and to act when an action needs to be taken and that

his mental health limits his ability to engage in those executive functions such that it does impact his health, safety, as well as his personal assets."

¶36    The circuit court further considered Peterson's testimony regarding Jerry's struggles with maintaining his independence, decision-making, and executive functioning.  The court noted that these struggles impact Jerry's manner of living in several ways: attempts to provide Jerry with housing generally ended in evictions; Jerry had a difficult time maintaining his apartment in a clean manner, given the mold in the bathtub, fruit flies and maggots in the kitchen sink, and the unclean oven; and the number of burn holes in the carpeting and furniture raised concerns for Jerry's safety.  In all, the court found that Jerry "struggled to provide for his own basic essentials while living" on his own.

¶37    The circuit court also considered Switlick's testimony and comprehensive evaluation, noting her opinion that there were "less restrictive means by which services and protections [could] be given to [Jerry] that [had] not yet been considered or utilized."  Despite this testimony, the court agreed with Dr. Kelly's testimony regarding Jerry's more limited ability to receive and evaluate information and to make decisions.  Jerry essentially asks us to reweigh the evidence and give more weight to Switlick's evaluation and testimony on these topics, which we cannot do.  *See Cogswell v. Robertshaw Controls Co.*, 87 Wis. 2d 243, 250, 274 N.W.2d 647 (1979) (noting that the circuit court "is the ultimate arbiter of the credibility of the witnesses").  The court evaluated Kelly's, Peterson's, and Switlick's testimony, and it gave more weight to Kelly's and Peterson's testimony.  The above evidence supports the court's conclusion in this regard.

¶38    Jerry also argues that Penny never showed that his issues "stemmed from his schizophrenia rather than from his illegal drug use," and therefore she could not show that Jerry's deficits were due to an impairment. He further asserts that the circuit court "did not evaluate whether Jerry's deficits were 'because of an impairment' or because of his drug use."

¶39    There is no evidence in the record, however, that Jerry's issues arise primarily from his drug use. In fact, the evidence shows that Dr. Kelly evaluated Jerry while he was sober. One of Kelly's reports noted that Jerry was sober during her evaluation, and she testified that he appeared sober, even though he had not been formally tested. Kelly's other report, which was a previous evaluation of Jerry, also noted that Jerry was sober at that time and that he had been formally tested.

¶40    In addition, Dr. Kelly testified about Jerry's drug use together with his psychotropic medications for schizophrenia. She explained that taking drugs with psychotropic medication interferes with the medication's effectiveness, that drugs can increase delusional thinking, and that they create an inability to make effective decisions. Thus, the evidence suggests that Jerry's issues stemmed primarily from his paranoid schizophrenia, regardless of whether he did or did not use drugs, and, in fact, those issues may have been exacerbated because of his drug use. The evidence does not suggest that Jerry's issues were due only to—or even primarily due to—his drug use and that his paranoid schizophrenia had simply disappeared.

¶41    Furthermore, the circuit court explicitly credited Dr. Kelly's diagnosis that Jerry suffered from paranoid schizophrenia and that it was a serious and persistent illness. Therefore, the court did determine that Jerry's deficits were

due to an impairment—his paranoid schizophrenia—and it did not err by concluding that Jerry's schizophrenia so affected his executive functioning that he was unable to meet his essential requirements for his own personal and physical health.

> *B. The evidence supports the circuit court's conclusion that, due to his impairment, Jerry cannot effectively receive and evaluate information or make or communicate decisions related to management of his financial affairs.*

¶42      Jerry next contends that Penny failed to show that because of an impairment, "Jerry was unable to receive and evaluate information or communicate decisions related to his financial affairs to the point his property would dissipate, he would be unable to provide for his support, or be unable to prevent financial exploitation." *See* WIS. STAT. § 54.10(3)(a)3.a.-c. Jerry argues that his behaviors, such as giving away items, making a mess of an apartment, and being evicted from apartments, are consistent with drug use, and while "Jerry's finances were depleted in the past due to drug use, … it is not clear that they would be again if he was no longer using drugs." Because his behaviors are due to drug use, Jerry asserts that all of the bad decisions that go along with drug use "do not amount to an inability to effectively receive and evaluate information."

¶43      As noted above, however, Jerry's behaviors were not simply due to his drug use, but rather they stemmed primarily from his paranoid schizophrenia, which affected his ability to receive information and make decisions, including those related to his finances. It is clear from Peterson's and Dr. Kelly's testimony that Jerry is vulnerable to financial exploitation. Their testimony supports the circuit court's conclusion that Jerry's mental illness affects the management of his finances. As Peterson testified, Jerry would allow other individuals to live with him when he had an apartment, and those individuals took advantage of Jerry. Of

particular concern to Peterson was the fact that Jerry purchased items that would subsequently disappear without Jerry's knowledge, and Peterson was unsure whether those items were stolen, given away, or traded.

¶44 The circuit court shared this concern, noting Peterson's testimony and finding that Jerry was vulnerable to being exploited by others, given his diagnosis. It further found that although Jerry had the ability to make a decision when confronted with one, he lacked the executive functioning to recognize when a decision had to be made and that his mental health limited "his ability to engage in those executive functions," such that it impacted his personal assets. Thus, the evidence focused on how Jerry's schizophrenia interfered with his ability to receive information and make decisions regarding his finances, and not on "bad decisions" resulting from Jerry's drug use.

*C. The evidence supports the circuit court's conclusion that Jerry's need for assistance in decision-making or communication cannot be met effectively through less restrictive means.*

¶45 Finally, Jerry contends that Penny failed to show that Jerry's need for assistance cannot be met through less restrictive means. *See* WIS. STAT. § 54.10(3)(a)4. Jerry again relies on Switlick's evaluation stating that Jerry liked working with Peterson and would not object to having Peterson help him as he had been, and her testimony that Jerry could receive the support he needed with assistance from a supportive decisionmaker, a spendthrift guardian, or through substance abuse treatment.

¶46 In contrast, Dr. Kelly opined that those less restrictive interventions would not eliminate Jerry's need for a guardianship. Instead, she opined that Jerry required health care and trained professionals, given that his needs had not been effectively supported through just the supportive services Jerry had been receiving

and a power of attorney. Kelly explained that Jerry required a higher level of care with services for his mental illness and with professionals who are trained to help him and understand his behaviors and what he is going through. She did not "only [say] a 24-hour supervised facility was the least restrictive because it would 'prevent elopement,'"[5] as Jerry contends.

¶47 Jerry argues that Dr. Kelly's testimony does not account for the fact that the attempted supportive services were provided to Jerry when he was using drugs. Again, Jerry relies on the premise that his issues stemmed primarily from drug use, and not his paranoid schizophrenia, but the evidence clearly shows the contrary. The attempted supportive services were provided to Jerry not only while he used drugs, but also while he constantly suffered from schizophrenia or exacerbated symptoms of schizophrenia due to his drug use. Peterson's testimony regarding Jerry's poor living conditions showed that supportive services by themselves were not effective and that Jerry required a higher level of housing assistance support. Thus, Peterson's testimony, taken together with Kelly's testimony, supports the circuit court's conclusion that Jerry's need for assistance in decision-making or communication is unable to be met effectively by less restrictive means.

---

[5] Doctor Kelly did state that a 24-hour supervised facility was necessary "to prevent elopement from a facility," but she did so in response to a question regarding Jerry's protective placement, which we discuss in the next section.

¶48    In all, Penny presented sufficient evidence supporting the requirements for a guardianship, and that evidence supported the circuit court's conclusion that Penny satisfied all of those requirements.[6]

## II. Protective Placement

¶49    Jerry also argues that Penny failed to provide sufficient evidence to satisfy the requirements for protective placement. Before addressing Jerry's arguments, however, we must first determine whether Jerry's appeal of his protective placement order is moot, given that the circuit court issued an order continuing Jerry's protective placement in August 2024, following an annual review. *See* WIS. STAT. § 55.18; *see also* **State ex rel. Watts v. Combined Cmty. Servs. Bd. of Milwaukee Cnty.**, 122 Wis. 2d 65, 84, 362 N.W.2d 104 (1985) (requiring annual review of protective placement). Jerry did not appeal the August 2024 order.

¶50    "An issue is moot when its resolution will have no practical effect on the underlying controversy." **Portage County v. J.W.K.**, 2019 WI 54, ¶1, 386 Wis. 2d 672, 927 N.W.2d 509. We generally decline to address moot issues, but we may choose to address those issues in "exceptional or compelling

---

[6] Jerry additionally argues that we should consider the fact that Marathon County was not the party petitioning for guardianship in this matter. The fact that the county is not a party is irrelevant to our determination of whether Penny presented sufficient evidence establishing the requirements for a guardianship. Regardless, such a fact was for the circuit court to consider, which it did when noting at the start of its oral ruling the "unique situation where a third party that's not a government agency brings forth a petition for a guardianship," and that the county, through Switlick, believed there were less restrictive means to provide Jerry with services. Thus, the court considered the fact that the county was not the petitioning party, and it still concluded that a guardianship was appropriate. Jerry is, again, simply asking us to reweigh the evidence and give more weight to the county's decision not to petition for guardianship.

circumstances." *Id.*, ¶12 (citation omitted). Mootness is a question of law that we review de novo. *Id.*, ¶10.

¶51 Jerry argues that his appeal is not moot simply because an annual review occurred. He asserts that "without the original protective placement order, there could be no continuing protective placement order." He also argues that his appeal is not moot because of the collateral consequences associated with protective placement orders, which include financial consequences and the stigma associated with him being subject to protective placement orders. He additionally argues that several exceptions to the mootness doctrine apply.

¶52 Penny does not respond to Jerry's arguments regarding collateral consequences and exceptions to mootness, but she argues that Jerry's appeal is moot because the circuit court entered a new order continuing Jerry's protective placement in August 2024, and he is no longer subject to the order underlying this appeal. Penny therefore asserts that the existence of the August 2024 order "precludes the 'practical legal effect' of any decision by this court" regarding the prior protective placement order, citing *Washington County v. T.R.Z.*, No. 2024AP21, unpublished slip op., ¶14 (WI App June 19, 2024),[7] as support. Nevertheless, Penny contends that we should address the merits rather than deciding the appeal solely on the issue of mootness.

¶53 Because both parties essentially agree that we should address the merits of this appeal, we conclude that Jerry's appeal of the protective placement

---

[7] An unpublished opinion authored by a single judge and issued on or after July 1, 2009, may be cited for its persuasive value. *See* WIS. STAT. RULE 809.23(3)(b).

order is not moot. Therefore, we address Jerry's arguments regarding his protective placement order.

¶54    In order for an individual to be protectively placed, a petitioner must show, by clear and convincing evidence, that: (1) "[t]he individual has a primary need for residential care and custody"; (2) the individual "is an adult who has been determined to be incompetent by a circuit court"; (3) as a result of a "serious and persistent mental illness, … the individual is so totally incapable of providing for his or her own care or custody as to create a substantial risk of serious harm to himself or herself or others"; and (4) "[t]he individual has a disability that is permanent or likely to be permanent." WIS. STAT. §§ 55.08(1)(a)-(d), 55.10(4)(d).

¶55    Because we have concluded that Penny established that Jerry was incompetent under WIS. STAT. § 54.10(3)(a), this conclusion satisfies WIS. STAT. § 55.08(1)(b). We therefore reject Jerry's argument that his protective placement order must be vacated if Penny failed to establish that Jerry was incompetent. Jerry alternatively argues that Penny failed to provide sufficient evidence on the remaining three requirements for protective placement.

> A. *The evidence supports the circuit court's conclusion that Jerry has a primary need for residential care and custody.*

¶56    Jerry first contends there was insufficient evidence showing that he has a primary need for residential care and custody. *See* WIS. STAT. § 55.08(1)(a). A person has such a need when he or she has a primary need "(1) to have his or her daily needs provided for in a residential setting; and (2) to have someone else exercising control and supervision in that residential setting for the purpose of protecting the person from abuse, financial exploitation, neglect, and self-neglect." ***Jackson County DHHS v. Susan H.***, 2010 WI App 82, ¶16, 326 Wis. 2d 246, 785

N.W.2d 677. Jerry continues to rely on his assertion that his issues were primarily due to his drug use, arguing that Penny did not show he could not live independently if he stopped using drugs.

¶57    The circuit court, however, found that Jerry has a primary need for residential care and custody due to his impairment—that being his paranoid schizophrenia and not his drug use—and this finding is supported by Dr. Kelly's and Peterson's testimony.  In particular, Kelly testified that Jerry's history of homelessness and allowing others into his living space who could take advantage of him or who could be harmful led her to conclude that Jerry did better with "a structured environment where … it's limited to who can come and go and has more control over access to drugs and substances and to keep him from becoming homeless."  She opined that Jerry required 24-hour supervision in a secured setting with monitored egress "to prevent elopement from a facility," and for the reasons she had already stated in relation to the guardianship.  *See supra* ¶46.  Kelly again repeated that Jerry required a higher level of care rather than protective services.

¶58    Given Peterson's testimony regarding Jerry's living conditions when he was on his own, the evidence reasonably supports the circuit court's conclusion that Jerry has a primary need for residential care and custody.  Jerry clearly could not, on his own, provide for his own daily needs, and he required someone else to protect him from abuse, financial exploitation, neglect, and self-neglect.  Again, the fact that Jerry actively used drugs when living on his own does not mean his drug use was the sole, or even primary, issue and that the schizophrenia simply disappeared.  Nor does it mean that upon stopping his drug use, Jerry could live independently with his paranoid schizophrenia diagnosis.  To the contrary, Peterson's and Dr. Kelly's testimony showed that Jerry cannot live independently

24

because his issues are due to his schizophrenia, not his drug use, and the court so found.

> B. *The evidence supports the circuit court's conclusion that, due to Jerry's serious and persistent mental illness, he is so totally incapable of providing for his own care or custody as to create a substantial risk of harm to himself.*

¶59    Jerry next contends that Penny failed to show that he is so "totally incapable of providing for his own care as to create a substantial risk of serious harm to himself or others." *See* WIS. STAT. § 55.08(1)(c). As used in § 55.08(1)(c), "care" means "that the person's incapacity to provide for his or her daily needs creates a substantial risk of serious harm to the person or others." **Susan H.**, 326 Wis. 2d 246, ¶17. A "[s]erious harm may be evidenced by overt acts or acts of omission," § 55.08(1)(c), but the statute does not require recent acts or omissions, **K.N.K.**, 139 Wis. 2d at 203. The substantial risk of serious harm cannot "be based on mere speculation but must be directly foreseeable from the overt acts or omissions of the individual." **K.N.K.** at 202; *see also* **Zander v. County of Eau Claire**, 87 Wis. 2d 503, 515, 275 N.W.2d 143 (Ct. App. 1979) ("Mere speculation as to difficulties [an individual] may encounter is not sufficient.").

¶60    Here, the circuit court concluded that Jerry is "so totally incapable of providing for his own care or custody as to create substantial risk of serious bodily harm … specifically to himself." Jerry asserts that the evidence from the hearing was inconsistent with this conclusion because the testimony showed "that Jerry had found himself in challenging positions, including being homeless, but he navigated those challenges by seeking shelter and help he needed." Jerry also points to Switlick's testimony that he could "bathe and toilet himself," feed himself, and could "get[] around on his own." He further adds that there was no

evidence of any specific acts or omissions by Jerry that could have reasonably created a substantial risk of serious harm to himself.

¶61　As to this requirement, Dr. Kelly opined that Jerry would put himself or others in danger if he were to become independent, given his history, his drug use, and his potential decision to become homeless. She also opined that Jerry's drug use together with his psychotropic medications created a risk of harm for Jerry, given the exacerbation of schizophrenia symptoms caused by mixing the two. Based on his observations of Jerry's living conditions, Peterson testified that Jerry's behaviors presented a risk of harm to himself, whether they were due to his drug use or his mental health instability, and they would continue to present a risk of harm to Jerry if there were not a "higher level of housing assistance support." The circuit court noted that Peterson's observations impacted, among other things, Jerry's safety. The court also found that Jerry was vulnerable to exploitation by others, given the disappearance of items he purchased and his allowance of others into his home.

¶62　While it is true there was evidence that Jerry could bathe, toilet, and feed himself, it was not the only evidence regarding his personal care. Jerry again appears to rely solely on Switlick's testimony to argue that the hearing evidence does not support the circuit court's findings. Yet, Switlick acknowledged that she had never observed Jerry's functioning in an independent setting. Further, the court gave more weight to Dr. Kelly's and Peterson's testimony than to Switlick's testimony, and their testimony supports the court's conclusion that Jerry was so totally incapable of providing for his own care and custody as to create a substantial risk of serious harm to himself.

¶63     Jerry then argues that Penny failed to prove that Jerry's incapacity to provide for himself resulted from a "serious and persistent mental illness," pointing again to his drug use. He again contends that his drug use is not a "serious and persistent mental illness," that the evidence showed Jerry used "drugs during all the times problematic behaviors were reported," and that "many of the bad situations Jerry found himself in are associated with severe drug use." "Serious and persistent mental illness" in WIS. STAT. § 55.08(1)(c) has the same definition as in the guardianship statute. *See* WIS. STAT. §§ 55.01(6v), 54.01(30); *see also supra* ¶27. As noted multiple times above, the testimony established, and the circuit court reasonably found, that Jerry's serious and persistent mental illness was his paranoid schizophrenia, not his drug use, and that his incapacity to provide for himself resulted from his schizophrenia, not his drug use.

### C. The evidence supports the circuit court's conclusion that Jerry's disability is permanent or likely to be permanent.

¶64     Jerry next contends that Penny failed to establish that his disability is permanent or likely to be permanent. *See* WIS. STAT. § 55.08(1)(d). In order to satisfy this requirement, the evidence must show that the individual's inability to care for himself or herself "due to the effects of her [or his] mental illness is permanent or likely to be permanent." *K.N.K.*, 139 Wis. 2d at 204. This requirement may be satisfied with a finding that an individual "is not treatable by presently known methods." *Id.* at 203.

¶65     Jerry acknowledges that Dr. Kelly testified that paranoid schizophrenia is a permanent diagnosis, but he notes there was also testimony that schizophrenia can improve with medication and that Jerry was, in fact, improving with a new medication regimen. He additionally contends that Penny failed to show which of his behaviors were due to schizophrenia instead of drug use. Kelly

testified that Jerry was compliant with his medications and sober from drugs at the time of her report, and she agreed that it was not uncommon for an individual "that has gone through a period of extended street drug use" to "not have developed the successful plan yet."

¶66    Peterson also testified about Jerry's medication changes, stating that

> it ebbs and flows as the medications have been adjusted on and off for one reason or another, primarily due to symptoms exacerbation. The current medication that he is on that was recently increased I see a little bit helping him. It's been a medication that he has been on in the past, and … I don't see it completely helping him fully yet.

Peterson nevertheless stated that Jerry's problems persisted even with routine treatment. Again, Dr. Kelly testified that Jerry's paranoid schizophrenia is something he will have to deal with for the rest of his life, given the lack of effective treatments for delusional thinking.

¶67    Simply because there was some evidence showing Jerry's condition was improving with a change in medication does not mean his paranoid schizophrenia is not permanent. There was overwhelming contrary evidence that even with improvements, Jerry's inability to care for himself due to his schizophrenia will remain. As Dr. Kelly noted, Jerry's condition cannot be fully treated with presently known methods. Thus, the evidence established that Jerry's paranoid schizophrenia is permanent or likely to be permanent, and it supports the circuit court's conclusion in this regard.

¶68    Finally, Jerry contends that the evidence was insufficient to support protective placement because Jerry was already subject to a WIS. STAT. ch. 51 commitment order. Because such orders "can involve corresponding involuntary

medication orders and can force a person to live in a 24-hour supervised, locked facility," Jerry contends that protective placement is unnecessary.

¶69     As Penny notes, however, WIS. STAT. ch. 51 emphasizes short-term treatment, while WIS. STAT. ch. 55 focuses on long-term care, and "the length of confinement is distinguished from the particular kind or quality of treatment." *See Watts*, 122 Wis. 2d at 92-93. Both chapters are clear "that restrictive treatment alternatives should cease when less restrictive alternatives appear." *See id.* at 93; *see also* WIS. STAT. §§ 51.20(13)(g), 55.18(1)(a)1.e., (3)(e)1. Given Jerry's paranoid schizophrenia, which continues to impact his executive functioning regardless of whether he is or is not using drugs, a long-term protective placement is more appropriate than the short-term ch. 51 commitment.

¶70     In all, there was sufficient evidence to support the requirements for protective placement and the circuit court's conclusion that those requirements were satisfied.

  *By the Court.*—Orders affirmed.

  This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.